**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DEBRA DANIELS and** | ) | |
| **DENNIS DANIELS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:16-cv-01977** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **ERIE INSURANCE GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM**</u>

Before the court is the defendant's Motion for Summary Judgment. (Doc. No. 16.) The motion has been fully briefed and is ripe for review. For the reasons set forth herein, the motion will be denied.

**I.      MATERIAL FACTS AND PROCEDURAL BACKGROUND**

On or about July 28, 2015, plaintiffs Debra Daniels and Dennis Daniels submitted a claim to defendant Erie Insurance Group ("Erie"), seeking coverage under their homeowner's insurance policy ("Policy") for damage to their residence caused by an alleged sinkhole. In response, Erie retained Rimkus Consulting Group ("Rimkus") to perform an inspection of the Daniels' property to determine the cause of the damage to the residence and specifically to determine if a sinkhole was present. The parties agree that, if a sinkhole caused the damage, then the damage is covered by the Policy. (*See* Policy, Sinkhole Collapse Endorsement – Tennessee, Doc. No. 16-2, at 33.)

Rimkus performed tests and inspections of the plaintiffs' residence, under the direction and supervision of a licensed Professional Engineer and a licensed Professional Geologist, and

issued a report dated December 22, 2015 (the "Rimkus Report") summarizing their findings. The Rimkus Report concluded, in a nutshell, that "sinkhole activity can be eliminated within a reasonable professional probability as a cause of the distress noted in the building." (Rimkus Report, Doc. No. 16-1, at 4.) The Rimkus Report ascribes the damage to the Daniels' residence to (1) differential foundation settlement, (2) soil erosion, and (3) decomposition of organic material. (*Id.*) Based on these conclusions, Erie notified the Daniels on February 1, 2016 that it was denying their claim. (Denial Letter, Doc. No. 16-3.)

The plaintiffs filed this lawsuit on June 30, 2016, asserting claims for breach of the Policy and bad faith in violation of Tenn. Code Ann. § 56-7-105, and seeking compensatory damages, a statutory bad faith penalty, and punitive damages.

The court entered an Initial Case Management Order in October 2016, setting deadlines for the identification and disclosure of expert witnesses and reports and rebuttal reports and dispositive motions, among others. (Doc. No. 10.) Trial was set to begin January 9, 2018. (Doc. No. 11.) On May 4, 2017, the parties filed a Joint Motion to Modify Initial Case Management Order (Doc. No. 14), requesting that the plaintiffs' expert disclosure and report deadline be extended until August 1, 2017 and that the defendant's rebuttal deadline be extended to August 15, 2017. Expert depositions would be completed by September 15, 2017. The parties noted that it was "wholly unlikely" that any dispositive motions would be filed, but they agreed that the deadline for such filing could be extended to September 27, 2017. They also agreed to an abbreviated briefing schedule in order to ensure that any dispositive motion would be fully briefed by or before October 11, 2017, thus "keep[ing] the trial date at least 90 days from the close of dispositive motions." (Doc. No. 14, at 2.) The court granted the motion. (Doc. No. 15.)

The plaintiffs' expert, Sonny Gulati of Florida Testing & Environmental, Inc. ("FTE"),

completed his initial Report on June 2, 2016 and a Revised Report on May 9, 2017, well within the plaintiffs' disclosure deadline. FTE's Reports state that FTE disagrees with the Rimkus Reports and opine that the structural damage to the plaintiffs' house was caused by a sinkhole.

Erie filed its Motion for Summary Judgment, supporting Memorandum, Statement of Undisputed Facts, and numerous exhibits (Doc. Nos. 16–18 ) on September 13, 2017, arguing, primarily, that FTE's Reports should be excluded and that, without any expert's testimony, the plaintiffs lack admissible evidence to counter the Rimkus Report regarding the cause of the damage to their residence.

On September 29, 2017, two days after the agreed-upon fourteen-day deadline for responding, the plaintiffs filed a Motion to Extend Time to Respond to the Motion for Summary Judgment. (Doc. No. 20.) There, they explained that they had been confused about the deadline for responding and that the Florida office of lead counsel had been in chaos following the September 11 landfall of Hurricane Irma. In addition, they disclosed that Erie, on September 15, 2017, had submitted to them a supplemental Report from Rimkus dated September 14, 2017, and that the depositions of their experts had not taken place prior to September 15, 2017, as the parties had agreed in the modified Case Management Order. Instead, they had been moved, by agreement, to September 20, 2017 (Erie's expert depositions) and September 28, 2017 (Gulati deposition). In other words, the defendant voluntarily filed its Motion for Summary Judgment prior to deposing the plaintiff's expert.

Further, in light of this court's July 2017 ruling regarding Gulati's proffered expert testimony in an unrelated case, *Walsh v. State Farm Fire & Cas. Co.*, No. 3:15-cv-1036, 2017 WL 3025592, at *6 (M.D. Tenn. July 17, 2017), and the supplemental Rimkus Report produced on September 14, the plaintiffs had FTE prepare a supplement to its Revised Report, dated

September 20, 2017. The plaintiffs expressed their hope that the Supplemental Report as well as the plaintiffs' cross-examination of Gulati during his deposition would alleviate the concerns expressed by the court in *Walsh* about the methodology employed by Gulati in drawing his conclusions about the cause of the damage to the plaintiffs' residence. The plaintiffs therefore requested that they be granted until ten days after Gulati's deposition transcript was made available to file their Response to the Motion for Summary Judgment. (Doc. No. 20, at 3.) The plaintiffs attached to their motion both the Rimkus September 14, 2017 Supplemental Report and FTE's September 20, 2017 Supplemental Report. (Doc. Nos. 20-1, 20-2.)

Erie did not oppose the request to extend the filing deadline, but it did oppose the Daniels' use of FTE's Supplemental Report in responding to the Motion for Summary Judgment, on the basis that this Report was not provided to them before they filed their Motion for Summary Judgment and, in fact, was not produced until 9:30 a.m. on the day they were to depose Gulati. Erie also explained the delay in its filing of the Rimkus Supplemental Report: plaintiffs' counsel had granted Erie an extension of the time to submit a rebuttal report until after the plaintiffs provided a complete copy of FTE's job file, including photos, logs, notes and other documents prepared by or relied upon by Gulati that were not contained in FTE's initial and revised reports. On August 15, 2017, Erie was provided the drilling logs from Richard Simmons Drilling, upon which Gulati had relied. "Assuming all job file materials had been produced by Gulati, on September 14, 2017, Erie submitted to counsel for Plaintiffs a rebuttal report from Rimkus" (Doc. No. 21, at 2), the day after filing its Motion for Summary Judgment.

The court granted the plaintiffs' request to extend the filing deadline, setting November 13, 2017 as the new deadline for filing their opposition to the Motion for Summary Judgment and allowing the defendant until November 27, 2017 to file a reply. In addition, however, while

noting that the plaintiffs would be permitted to use Gulati's deposition transcript in support of their position on summary judgment, the court made it clear that it would exclude from consideration any opinions offered by Gulati in the late-filed Supplemental Report in ruling on the Motion for Summary Judgment. (Doc. No. 22.)

The plaintiffs' Response, filed on November 13, 2017, was timely, and the defendant promptly filed a Reply on November 22, 2017.

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**B.    *Daubert* and the Federal Rules**

Although styled as a motion for summary judgment, the defendant's motion depends in large part upon an argument that the plaintiffs' proffered expert witness's testimony violates Rule 702 of the Federal Rules of Evidence and Rule 26(a) of the Federal Rules of Civil Procedure, which together govern the admissibility of an expert witness's testimony at trial.

Under Rule 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The district court acts as the "gatekeeper" on opinion evidence, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997), and must exercise its gatekeeping function "with heightened care." *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (citation omitted).

"As gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 453 (6th Cir. 2013) (quotation marks and citation omitted). The court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993).

However, the court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Indeed, rejection of expert testimony is the exception rather than the rule—the gatekeeping function established by *Daubert* was never "intended to serve as a replacement for the adversary system." *Rose v. Matrixx Initiatives, Inc.*, No. 07-2404-JPM/tmp, 2009 WL 902311, at \*7 (W.D. Tenn. March 31, 2009) (quoting Fed. R. Evid. 702 advisory committee's note).

Rule 702 does not "require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010). Under *Daubert*, "experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012) (internal quotation marks and citation omitted). "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they *know* the answer to all the questions a case presents. . . ." *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (internal citation omitted). By the same token, "the 'knowledge' requirement of Rule 702 requires 'more than subjective belief or unsupported speculation.'" *Tamraz*, 620 F.3d at 670 (quoting *Daubert*, 509 U.S. at 590). Lastly, the "party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (quoting Daubert, 509 U.S. at 592 n.10).

In conjunction with Rule 702, Rule 26 requires disclosure of all expert witnesses, along with a written report prepared and signed by the expert. Fed. R. Civ. P. 26(a)(2). The written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii).

## IV. ANALYSIS

The defendant moves for summary judgment on the plaintiffs' claims for breach of contract, bad faith in violation of Tenn. Code Ann. § 56-7-105, and punitive damages. (Doc. No. 16, at 1.) In their Response, the plaintiffs expressly withdraw their claim for bad faith and the associated statutory penalty as well as their claim for punitive damages. (Doc. No. 24, at 1 n.1.) Thus, the only claim remaining is for breach of the Policy.

As to that issue, Erie argues that the Daniels' proffered expert's reports are inadmissible and, therefore, that the plaintiffs have no evidence to support their assertion that the damage to their house was caused by a sinkhole. The plaintiffs argue that the expert report, considered in conjunction with the expert's deposition, is admissible and creates a material factual dispute as to whether sinkhole activity caused the damage. They also contend, in the alternative, that "decomposition of organic material," one of the causes to which Erie's expert attributes the damage to the plaintiffs' residence, is not specifically excluded and therefore is also a covered cause of damage.

Under Tennessee law, "courts should construe insurance contracts in the same manner as any other contract." *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). A claim for breach of contract under Tennessee law requires the plaintiff to prove the existence of an enforceable contract, non-performance amounting to a breach of that contract by the

opposing party, and resulting damages. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). Erie does not dispute the existence of a valid insurance contract. The question presented by its Motion for Summary Judgment is whether Erie's denial of the Daniels' claim amounts to a breach of that contract. To survive summary judgment on this question, the plaintiffs must show the existence of a material factual dispute as to whether a covered event caused the damage to their residence.

### A.   Admissibility of FTE's Reports

Gulati, according to his signature line on the FTE Reports, is a registered Professional Engineer, registered Environmental Property Assessor, and Certified Florida Environmental Auditor. He is licensed as a Professional Engineer in both Florida and Tennessee (*see* Doc. No. 16-6, at 2), and his specialization is geotechnical engineering. (Gulati Dep. 6, 8, Doc. No. 24-4, at 2.) The defendant does not dispute his qualifications to offer an opinion in this case. It contends, instead, that opinions proffered by Gulati do not satisfy *Daubert* because they fail to disclose the reasoning or methodology behind those opinions.

As the *Daubert* Court stated:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, 509 U.S. at 592–93 (footnotes omitted).

### 1.   *The Initial Report*

In FTE's initial Report, Gulati specifically states that his firm was engaged to "conduct[] a review of the 'Report of Findings' dated December 22, 2015 prepared by Rimkus Consulting Group, Inc." (Doc. No. 16-11, at 1.) In other words, Gulati's opinions in the initial Report are

based entirely on the testing conducted by Rimkus. He describes the factual findings made in the Rimkus Report, including a detailed description of the damage to the plaintiffs' residence and the investigation conducted by Rimkus. He summarizes the ultimate opinion reached in the Rimkus Report: that "sinkhole activity can be eliminated within a reasonable probability as a cause of distress noted in the building" and that the damage was caused, in part, by "differential settlement which was exacerbated by the inadequate foundation embedment." (*Id.*)

Gulati states that he does not concur with that conclusion and that it is his professional opinion, "based on the data presented," that "sinkhole activity is present at the subject residence" and that "structural damage has occurred at the subject residence." (*Id.*) With regard to the Standard Penetration Test borings conducted by Rimkus, Gulati states: "[I]t is my professional opinion that the data reported in of [sic] the borings indicate systematic weakening of soils. Weight of rod condition was encountered in B-2 [test site]." (Doc. No. 16-11, at 3.) No other analysis of the evidence or explanation of the methodology used to reach his conclusions is included in the Report. Instead, Gulati goes on to discuss remediation: "We believe that conclusive evidence of an ongoing sinkhole loss has been discovered, therefore we recommend the subject structure should be stabilized by underpinning." (*Id.*) He describes the underpinning process and the costs associated with it. (*Id.* at 3–4.)

This Report, standing alone, clearly fails to satisfy *Daubert* and is insufficient to give rise to a material factual dispute as to whether the damage to the plaintiffs' residence was caused by a sinkhole, principally because it contains no explanation of the methodology used, or the application of the methodology to the facts, to justify the conclusion that sinkhole activity was present at the plaintiffs' property. The court further notes that the Initial Report never actually states that sinkhole activity caused the damage to the residence. Rather, it states, in the

disjunctive, that sinkhole activity is present and that structural damage has occurred. Gulati makes no attempt to link those two findings. Moreover, the FTE initial Report does not explain the methodology by which Gulati determined that the Rimkus Report, or the investigation on which it was based, is in some way inaccurate or unreliable. The court concludes that the initial Gulati Report fails to satisfy the *Daubert* requirements or Rule 702. *Accord Walsh v. State Farm Fire & Cas. Co.*, No. 3:15-cv-1036, 2017 WL 3025592, at *6 (M.D. Tenn. July 17, 2017) (likewise finding expert report prepared by FTE and Gulati to be inadmissible). More importantly for purposes of the Motion for Summary Judgment, the Report does not constitute evidence that a jury would be permitted to consider.

### 2. The Revised FTE Report

The Revised Report essentially supersedes the initial Report. Erie argues that the FTE Revised Report too must be excluded for failure to comply with Rule 702 or *Daubert*. More specifically, it contends that the Report "contains no explanation of the methodology used or the application of any methodology to the facts justifying the conclusion that the damage to the plaintiffs' residence is caused by sinkhole." (Doc. No. 17, at 9.) Instead, Erie argues, the Report "describes the tests that were conducted and the results thereof" but "fails to explain how it used these results to determine the conclusion that the damage to the plaintiffs' residence is caused by sinkhole activity." (*Id.*) Finally, the Report fails to "explain the methodology by which it determined that the Rimkus Report, or the investigation upon which it was based, is in some way inaccurate or unreliable." (*Id.*).

In response, the plaintiffs insist that evaluation of expert testimony should be left to the jury and that the plaintiffs, and Gulati, have made every effort to address the concerns expressed by the court in *Walsh*. The plaintiffs specifically request that the court "peruse Mr. Gulati's

deposition transcript" from pages 75 through 130, "which supplements and elaborates in great depth Mr. Gul[ati's] methodology of applying generally accepted engineering practices and sinkhole investigation techniques to the circumstances of this case." (Doc. No. 24, at 12.) The plaintiffs insist that this explanation does not constitute a "new opinion" not disclosed in the expert report but, instead, is "simply an elaboration on the opinion in the two prior reports." (*Id.*)[1]

In its Reply, Erie argues that the court should not consider Gulati's deposition testimony on cross-examination, in which plaintiffs' counsel attempted to cure the deficiencies in the Revised Report. The deposition was a discovery deposition requested by the defendant, at which the plaintiffs took the opportunity to allow their expert to further explain his findings, at the defendant's expense. (Doc. No. 26.)

In the Revised Report, dated May 9, 2017, Gulati again catalogs the list of problems with the plaintiffs' residence that are noted in the Rimkus Report, consisting of cracks in the foundation and walls of the house, door misalignments, cracked tiles and displaced grout, as well as open surface depressions on the ground alongside one section of the foundation wall and near a corner downspout, erosion channels, and so forth. (Doc. No. 16-6, at 3–4.) This time, however, rather than relying solely upon the tests and observations conducted by Rimkus, FTE hired a subcontractor, Richard Simmons Drilling Co., to perform four Structural Standard Penetration Test ("SPT") borings. (*Id.* at 4.) Based on the results of the SPT borings, the information obtained from the homeowner, and his review of all of the data relayed by Rimkus, the Revised

---

[1] The plaintiffs also refer to the deposition testimony of John Edwards, P.E., geotechnical expert for defendant in the case of *Alonso v. Florida Insurance Guaranty Association*, No. 11-003276 (Fla. 13th Judicial Dist. Ct). (*See* Doc. No. 24-9.) It is entirely unclear to the court how that deposition or any other documents from that case could be deemed to bolster the admissibility of the plaintiff's expert report in this case.

Report concludes:

> [T]he damage to the subject Daniels residence is caused by sinkhole activity. In my professional judgment, the totality of scientific data (collected by [Rimkus] & FTE) evaluated to render an opinion is sufficient to conclude sinkhole activity as the primary cause of distress/damage within a reasonable professional probability.

(*Id.* at 4.)

In support of this opinion, Gulati appends a Sinkhole Investigation Fact Sheet, which identifies the "Scope of Investigation" as including the four SPT borings which, he claims, demonstrated "zones of high porosity interconnected to voids and/or solution channels." (*Id.* at 5.) He describes the condition of the bore samplings as confirming "[r]aveling of soil/sediment, systematic weakening of soil-sediment, zones of high porosity and dissolution of limestone coupled with intermixing of clay with limestone." (*Id.*)

He then describes in greater detail the process of conducting the four SPT borings. The drilling was performed by a truck-mounted drill rig operation by Richard Simmons Drilling Co. Each boring extended to a depth of from 15.5 to 21 feet below the land surface, and each SPT boring location is identified on a plan attached to the Report. The FTE Revised Report states:

> Representative soil samples from the test borings were obtained by means of the split barrel sampling procedure in general accordance with ASTM specification D 1586. A copy of this procedure is included in the Appendix.[2] The Structural Standard Penetration test results are the results of recorded blow counts with a 140 pound hammer falling freely thirty inches, driving drill rods attached to a standard 2" O.D. sampler.
>
> In the standard manner, the sampler is seated six (6) inches into the bottom of the test hole and then advanced an additional 18.0 inches. All advancement of the sampler is accomplished by the dynamic effort of the hammer. Blows are applied until eighteen (18) inches of penetration are reached or until an excessive blow count is attained. The sampler is then removed from the test hole, opened, and the soil sample sealed in a plastic bag.
>
> A representative of our firm maintained a field log of the soil samples recovered

---

[2] A copy of this procedure is *not* included in the court's record.

in the field. All the soil samples were sealed, labeled and delivered to our laboratory for further examination and classification. The soil samples were visually inspected and classified on the basis of texture and plasticity in accordance with the Unified Soil Classification System.

Finally, it is our opinion that the actual transition between soil stratas is often gradual, thereby implying that the boundaries between soil types as indicated on the attached boring logs are approximate.

(*Id.* at 6.)

Gulati then describes very generally the samples recovered from each boring location (*see, e.g.*, *id.* at 7 ("This test boring revealed top soil to clay in the upper 2.5 feet, followed by firm, sandy clay to 5.0 feet and very soft clay to 20.0 feet. Very dense limestone was then found . . . and continued to the boring termination depth of 21.0 feet.").) Attached to his report is a set of graphs showing the number of hammer blows required to reach a given depth at each boring location. In particular, the graph for SPT-1, the first boring, shows a very low number of hammer blows per 18 inches of drilling, presumably implying soft dirt and low resistance, down to approximately 20 feet, where the drill struck limestone. (Doc. No. 16-6, at 11.) The SPT-4 bore showed a low number of hammer blows required to bore through the first five feet of dirt. (Doc. No. 16-6, at 14.) The Report does not actually explain the import of these findings, however, but it outlines the "basis of conclusions" as follows:

- The subject structure is underlain by karst conditions.[3]

- The minor differential settlement is not the cause of distress at the subject residence. The cause of the damage is deep rooted. The structure was built in 1999 and the distress was noticed recently and is still ongoing.

---

[3] Although the FTE Report does not explain what is meant by "karst conditions," Gulati explained in his deposition that "'karst' means – first of all, karst comes from the – from the limestone. When the limestone comes in contact with the groundwater, groundwater which has an acid in it, that acid can go and dissolve the calcium carbonate from the limestone. And that calcium carbonate weakens the rock, and the upper soil sediment can start moving into the limestone. That is karst condition." (Gulati Dep. 32, Doc. No. 24-4, at 8.)

- Closed depressions which might indicate sinkhole activity were located within one mile of the subject residence.

- Systematic weakening of soil/sediment was encountered in SPT-1 and SPT-4.

- The main house floor system has undergone significant differential settlement of up [sic] 2.5 inches. This is excessive in light of geologic conditions and the fact that sinkhole activity does not usually manifest itself on the ground surface. As foundation system needs remediation, it is recommended that the remediation must include underpinning.

- The main house concrete floor system has undergone an abnormal amount of differential settlement due to underlying karst conditions.

   **Note: My professional opinions, within a reasonable degree of professional probability, are based on review of all the scientific data available including, but not limited to data collected by [Rimkus] & FTE, historical aerial maps, topographic quad map of the area, and application of statutory definitions of sinkhole, sinkhole activity, and sinkhole loss.**

(Doc. No. 16-6, at 8.)

In addition to this Revised Report, however, the record now also includes Gulati's deposition testimony. In this deposition, plaintiffs' counsel examined Gulati regarding his opinions and how he reached them, and Gulati expanded upon his conclusions. For example, he explained the results from the SPT at the first bore site as follows:

   Q.    Okay. Looking at Standard Penetration Boring B-1, do you see any systematic weakening of the soils as described by the statute?

   A.    Yes.

   Q.    And where do you see that at?

   A.    I see the systematic weakening – first of all, I see the soil sediment where the intermixing of the soil sediment in the shallow zone. That is starting at six feet down to a depth of ten feet. And then the systematic weakening starts at ten feet, where the blow count goes from 57 to 29 to 6. . . . And then if you look at the 20 foot sample, or right above it, you can see a yellow-ish or brown-ish yellow silty clay with limestone fragments or rock fragments. That is a dissolution of limestone.

   Q.    At 15 feet did it also have limestone fragments in the soil?

A.      Yes.

Q.      Okay . . . . And, in your opinion, the presence of the fragments from 15 to 20 feet could indicate that there has been a dissolution of limestone?

A.      Yes.

Q.      Okay. Do you have an opinion as to whether that dissolution of limestone has caused – or has resulted in the raveling of soils or sediments or rock into subterranean voids created by the effect of ground water erosion on limestone?

A.      Yes.

Q.      And what's your opinion in that regard?

A.      Well . . .[t]he limestone has gone through dissolution. Upper soil sediment has been intermixing with the limestone. And I think that is also reflected in one of the hand augur borings by Rimkus.

. . . .

A.      You can see that photograph Number 25, you can see how that organics is intermixed with the clay material?

Q.      Yes.

A.      So basically what happens is because of the presence of sinkhole activity where the rainwater hits that area, the organics which is supposed to be on the surface, those organics slowly but surely have been moving into the upper material. And the same phenomenon happens if you go deeper down, where the upper soil has been moving into limestone. So that all reflects sinkhole activity.

(Gulati Dep. 94–96, Doc. No. 24-4, at 24.)[4] Gulati also testified repeatedly that it is "common practice in his industry" to rely on the particular data and testing that he relied on to reach his conclusions. (*See, e.g.*, Gulati Dep. 104, Do. No. 24-4, at 26.) And he provided an explanation for his rejection of many of the defendant's expert's opinions. (*See, e.g.*, Gulati Dep. 83–84, Doc. No. 24-4 at 21 (explaining rationale for rejecting Rimkus's opinion that the damage to the

---

[4] Plaintiffs' counsel used a green highlighter on Gulati's deposition transcript, presumably to bring to the court's attention those portions of the transcript counsel believed to be most relevant. Unfortunately, the green marker had the effect of rendering many of the highlighted lines difficult to decipher and some, completely illegible. (*See, e.g.*, Gulati Dep. 83–84, Doc. No. 24-4, at 21.)

residence was caused by decomposition of organic materials).)

There is some merit to the defendant's contention that the Revised Report does not contain sufficient information about Gulati's methodology or basis for reaching his opinions. "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005). A "'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *Id.* (citation omitted). Moreover, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, however, the defendant does not actually move to bar Gulati from testifying as a sanction pursuant to Rule 37. Instead, Erie contends that the information in his Reports is not sufficient to satisfy Rules 702 and 26(a)(2) and should be excluded under *Daubert*, as a result of which the plaintiffs would lack any admissible evidence to support their theory of the cause of the damage to their residence.

Given the actual state of the record in this case, the court is compelled to disagree. First, the Sixth Circuit has expressly observed that Rule 26 "does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). In this case, Gulati was actually deposed, and he was extensively questioned—albeit

by plaintiffs' counsel—about the basis for his opinions. While Rule 26(a) seeks to prevent "ambush at trial" and to "shorten or decrease the need for expert deposition," *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010), "those concerns can become moot when a deposition is actually taken." *United States v. Roberts*, 830 F. Supp. 2d 372, 387 (M.D. Tenn. 2011) (citing *E.E.O.C. v. Freemen*, 626 F.Supp.2d 811, 821 (M.D. Tenn. 2009)). "Moreover, because one purpose of Rule 26(a)(2) is to provide notice, a deposition disclosure may be curative." *Id.* (internal quotation marks and citation omitted).

In this case, Gulati's deposition was actually taken more than three months prior to trial, and Erie does not argue that it will be prejudiced at trial based on an inability to adequately prepare for cross-examination. In his deposition, Gulati has offered sufficient explanation of the methodology behind his opinions to create a material factual dispute as to the cause of the structural damage to the plaintiffs' residence and, consequently, as to whether the defendant is contractually obligated to cover the claimed loss. He explained that it is common in the industry to rely on the results of physical testing performed by others; he explained the basis for his conclusion that sinkhole activity is present on the plaintiffs' property; and he substantiated his disagreement with the defendant's expert. He identified the data upon which he relied and generally what he took from the sources to arrive at his conclusions from the perspective of a geotechnical engineer.

Although unorthodox and somewhat unfair to Erie, the testimony elicited by the plaintiffs at Gulati's deposition has effectively cured what otherwise might have been a fatal failure to comply with Rule 26(a)(2). And the court notes, again, that Erie voluntarily submitted its Motion for Summary Judgment prior to deposing Gulati. Certainly, Erie has pointed out inconsistencies and weaknesses in Gulati's opinions. The court nonetheless finds that the defendant's attacks

challenge the credibility of Gulati's testimony rather than its admissibility. As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See also Roberts*, 830 F. Supp. 2d at 387 ("*Daubert* sets out a flexible and more lenient rule that favors the admission of any scientifically valid expert testimony, and [c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." (internal quotation marks and citations omitted)).[5]

In light of this ruling on the admissibility of Gulati's deposition testimony and expert report, the court finds that there is sufficient evidence in the record to give rise to a material factual dispute as to whether the damage to the plaintiffs' residence was caused by sinkhole activity and, therefore, as to whether the damage is covered by the Policy. The defendant's Motion for Summary Judgment will, therefore, be denied.

---

[5] In *Travelers Property & Casualty Corp. v. General Electric Co.,* 150 F. Supp. 2d 360 (D. Conn. 2001), the district court denied the defendant's motion to exclude the plaintiff's expert witness's testimony, even though both the expert report and the expert witness's twelve-day deposition failed to fully disclose the expert's methodology for reaching his opinions, because the expert's methodology and bases for his opinions were fully revealed during a *Daubert* hearing conducted after the plaintiff moved to exclude the evidence. As the court stated:

> Were the court to have considered only [the] expert report, his deposition testimony and the parties' briefs, it likely would have reached a different result. . . . The inadequacy of [the expert's] disclosure and the weaknesses evident in his deposition testimony, however, are not dispositive of the motion in limine. The court must determine whether the opinion that [the expert] more fully articulated during the July 16, 2001 *Daubert* hearing is admissible at trial under Fed. R. Evid. 702 and the principles of *Daubert* and *Kumho Tire*. Simply put, Rule 702 and *Daubert* set standards for the admissibility of trial evidence, not requirements of pretrial procedure. If [the expert] has a relevant and reliable opinion to offer that will assist the trier of fact to determine the cause of the dryer fires at issue, that opinion should be admitted into evidence

*Id.* at 365–66. While finding the expert's opinion admissible, however, the court also concluded that the expert's three-page expert report was in bad faith for which sanctions were warranted, in the form of requiring the plaintiff to reimburse the defendant for one-third of its costs and expenses in taking the first twelve days of the expert's deposition. *Id.* at 368.

B.      **Decomposition of Organic Materials**

The plaintiffs argue, in the alternative, that "decomposition of organic material," one of the causes to which Erie's expert attributes the damage to the plaintiffs' residence, is not specifically excluded and therefore is a covered cause of damage under the Policy. Having concluded that the defendant's Motion for Summary Judgment must be denied on the basis that Gulati's report and testimony will be admissible, the court declines to reach this alternative argument for denying the motion. The court also notes that the plaintiffs did not actually file their own motion for summary judgment on this ground and finds that the issue has not been adequately briefed to be considered as a separate basis for summary judgment in favor of either party.

V.      **CONCLUSION**

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be denied.

An appropriate order is filed herewith.

ENTER this 4th day of December 2017.

ALETA A. TRAUGER
United States District Judge